UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

EDDIE JAMES MOULTRIE,

               Plaintiff,

v.                              Case No. 3:23-cv-472-MMH-JBT

CAPTAIN JAMES, et al.,

               Defendants.

_____

## **ORDER**

### I.    Status

Plaintiff Eddie James Moultrie, an inmate in the Florida Department of Corrections (FDOC), initiated this case by filing a pro se Civil Rights Complaint (Doc. 1) against Captain James and Officer Hansen. Moultrie alleges Defendants violated his Eighth Amendment right to be free from cruel and unusual punishment by ordering or using excessive force against him.

Before the Court is Defendants' Motion to Dismiss (Doc. 25; Motion). Moultrie filed a response in opposition to the Motion (Doc. 27; Response). The Motion is ripe for review.

## II.     Complaint[1]

According to Moultrie, on May 26, 2022, while housed in administrative confinement, Moultrie began complaining to correctional staff about his inability to sleep and the resulting effects. Complaint at 7. Security staff advised Moultrie "there was nothing they could do and so [Moultrie] declared a mental health emergency." Id. At that time, Moultrie "was already a prisoner classified with a S-3 mental health grade and prescribed medication to assist in managing [his] mental health." Id. In response to his declared mental health emergency, staff removed Moultrie from his cell and placed him in a holding cell to monitor his mental health status. Id.

Later, staff returned Moultrie to his cell, but because Moultrie felt as though he was in "imminent danger," he "refused to submit to hand-restraints." Id. Defendant James arrived at Moultrie's cell, and Moultrie explained to him "why it was dangerous for [him] to be housed with a roommate," but Defendant James "was not concerned and so a camera operator was called in anticipation of a use of force." Id. at 8. Moultrie "eventually

---

[1] In considering the Motion, the Court must accept all factual allegations in the Complaint as true, consider the allegations in the light most favorable to Moultrie, and accept all reasonable inferences that can be drawn from such allegations. Hill v. White, 321 F.3d 1334, 1335 (11th Cir. 2003); Jackson v. Okaloosa Cnty., 21 F.3d 1531, 1534 (11th Cir. 1994). As such, the facts recited here are drawn from the Complaint, and may well differ from those that ultimately can be proved.

submitted to hand-restraints and was moved to the shower where [he] submitted to a strip search and beg[a]n to comply with orders to return to [his] original cell." Id. However, "the fear of reality settled in and [Moultrie] instead threw [him]self into the shower door screaming staff assault while laying down on [his] stomach refusing to stand up hoping [his] behavior would sway securit[y's] intent however it did not." Id.

Additional security staff arrived to assist placing leg restraints on Moultrie, and they carried him to his cell. Id. During the transport, Defendant James directed staff to house Moultrie in a vacant cell, "but one of [Defendant James's] subordinates overrode his authority and [Moultrie] was forced back in [his] original cell with a roommate." Id. Staff removed Moultrie's leg restraints, but after his cell door was closed, Moultrie refused to relinquish his hand restraints. Id. Staff turned off the use of force camera. Id.

"Seconds later," Defendant Hansen approached Moultrie's cell, stared at Moultrie through the cell window while Moultrie was on the toilet, and then motioned another officer over and sprayed chemical agents into Moultrie's cell without warning. Id. at 8-9. Staff turned the use of force camera back on, and Moultrie was taken to a decontamination shower and then to a medical exam. Id. at 9. Staff then rehoused Moultrie in a vacant cell without incident. Id.

Moultrie did not receive a disciplinary report, but staff placed him on heightened security status and eight days later, he was referred to close management. Id. The close management referral stated: "On 5/26/2022 [Moultrie] was observed holding [his] roommate in a headlock actively choking him and chemical agents w[ere] used to prevent further harm to [Moultrie's] roommate and that later during the use of force[, Moultrie] attempted to kick at staff." Id. According to Moultrie, however, "Defendant(s) intentionally manipulated the facts creating false, misleading and inaccurate information which unfortunately got [Moultrie] approved for CMII status." Id.

As a result of these actions, Moultrie asserts that Defendant James violated his Eighth Amendment rights by "deliberately authorizing force to be used to put [Moultrie] in a cell with another inmate after [Moultrie] blatantly informed [Defendant James] that [Moultrie] was under mental distress and in fear of [his] life," and Defendant Hansen, "motivated by retaliation[,] maliciously and sadistically inflicted unnecessary and wanton pain when he sprayed [Moultrie] with chemical agents." Id. at 5.[2] Moultrie seeks

---

[2] In Moultrie's Response, he confirms that the only claim he raises against Defendant Hansen is a violation of the Eighth Amendment for use of excessive force when Hansen sprayed Moultrie with chemical agents. Response at 17 ("[N]owhere in the complaint has [Moultrie] made any allegations accusing Defendant Hansen of violating his rights under the First Amendment. . . . [Moultrie] only accused

compensatory and punitive damages for the time he spent on close management, along with compensatory damages for "physical pain from the chemical agents, personal humiliation, mental anguish, emotional distress," and the diminished quality of life he endured while on close management. Id. at 10. He seeks punitive damages against "Defendant James who acted with reckless indifference to [his] safety by using force to put [him] in the cell with a roommate after [Moultrie] not only warned [James] that [Moultrie] was in fear of [his] life [but Moultrie] also had to become unruly and [James] being the supervisor still allowed [Moultrie's] life to be placed in danger." Id. Moultrie also seeks punitive damages against Defendant Hansen for spraying Moultrie with chemical agents while he was in hand restraints and then subsequently falsifying his report which caused Moultrie to be wrongfully placed on close management.[3] Id.

## III.   Motion to Dismiss Standard

In ruling on a motion to dismiss, the Court must accept the factual allegations set forth in the complaint as true. See Ashcroft v. Iqbal, 556 U.S.

---

Defendant Hansen of violating his Eighth Amendment right . . . when he deliberately sprayed [Moultrie] unnecessarily with chemical agents.").

[3] Moultrie states in his Response that "[t]he defense also alleges [Moultrie] accused Defendant Hansen of fabricating the Report of Close Management . . . . However that too never happened." Response at 17.

662, 678 (2009); <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506, 508 n.1 (2002); <u>see also</u> <u>Lotierzo v. Woman's World Med. Ctr., Inc.</u>, 278 F.3d 1180, 1182 (11th Cir. 2002). In addition, all reasonable inferences should be drawn in favor of the plaintiff. <u>See</u> <u>Randall v. Scott</u>, 610 F.3d 701, 705 (11th Cir. 2010). Nonetheless, the plaintiff must still meet some minimal pleading requirements. <u>Jackson v. BellSouth Telecomm.</u>, 372 F.3d 1250, 1262-63 (11th Cir. 2004). Indeed, while "[s]pecific facts are not necessary[,]" the complaint should "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" <u>Erickson v. Pardus</u>, 551 U.S. 89, 93 (2007) (per curiam) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007)). Further, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." <u>Twombly</u>, 550 U.S. at 570. "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Iqbal</u>, 556 U.S. at 678 (citing <u>Twombly</u>, 550 U.S. at 556).

A "plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" <u>Twombly</u>, 550 U.S. at 555 (internal quotations omitted); <u>see also</u> <u>Jackson</u>, 372 F.3d at 1262 (explaining that "conclusory allegations, unwarranted deductions of facts or legal conclusions

masquerading as facts will not prevent dismissal") (internal citation and quotations omitted). Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions[,]" which simply "are not entitled to [an] assumption of truth." Iqbal, 556 U.S. at 678, 680. Thus, in ruling on a motion to dismiss, the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face[.]'" Id. at 678 (quoting Twombly, 550 U.S. at 570).

## IV.   Discussion

In the Motion, Defendants contend that Moultrie failed to exhaust his administrative remedies prior to filing this case.[4] See Motion at 4-13. They acknowledge that Moultrie filed several grievances, but argue that none of those grievances addressed the issues raised in the Complaint and Moultrie did not properly comply with the FDOC's three-step grievance process. See id. In Moultrie's Response, Moultrie contends that the institution was not processing grievances, so "to protect hi[m]self in case an issue such as this arises," he would send a duplicate copy of his formal grievances to the

---

[4] Defendants raise other arguments as well. However, because the Court finds that Moultrie failed to exhaust his administrative remedies prior to filing this case, the Court need not address Defendants' other arguments.

Secretary's office. See Response at 5-6. He argues that the grievance logs show that his grievances at the institutional level were not being processed until June 16, 2022, which was two days after the Secretary's office responded to his grievance appeal regarding the breakdown in the grievance process at the institutional level. See id. at 6 ("It's no coinciden[ce] that the Institution didn't start processing grievances until two days after the Central Office was made aware they were not processing them."). Moultrie concludes that "reasonable factfinders can see the connection that further solidifies [his] factual claim that the Institution made it impossible for him to complete the first two-steps of the grievance process within the '20 days from the time [the] event being grieved occurred.'" Id. at 6-7.

### a. Moultrie's Exhaustion Efforts

Between May 26, 2022 (the date of the incident) and April 24, 2023 (the date the Clerk opened this case), the grievance summaries attached to Defendants' Motion show that Moultrie submitted 91 informal grievances and 41 formal grievances. See Doc. 25-2 at 3-7, 13-15. According to the Declaration of Officer C. Davis-Cotton, the informal grievance coordinator at Santa Rosa Correctional Institution, Moultrie filed four informal grievances relating to the May 26, 2022 incident, all of which the institution returned, and three formal grievances relating to the May 26, 2022 incident that were either denied (log

#2206-201-112 and #2206-201-140) or returned without action for bypassing the previous level of review (log #2208-510-070). <u>Id.</u> at 1. The institution did not approve any informal or formal grievances in relation to the use of force incident on May 26, 2022. <u>Id.</u> at 1-2.

During that same timeframe, Moultrie submitted 36 grievance appeals, five of which related to the May 26, 2022 incident. <u>See</u> Declaration of Lawanda Sanders-Williams (Doc. 25-1) at 1; <u>see also</u> <u>id.</u> at 3-6. The Secretary's office returned three of those appeals and denied two. <u>Id.</u> at 1. Moultrie did not have any approved grievance appeals concerning the May 26, 2022 incident. <u>Id.</u> at 1-2.  The following is a summary of Moultrie's relevant informal grievances, formal grievances, and grievance appeals and the responses thereto.

Moultrie authored the first relevant informal grievance on June 20, 2022 (log #201-2206-0180), noting that classification failed to respond to his request for information and he asked why he had been housed in confinement without a disciplinary report from April 29, 2022, leading up to the May 26, 2022 incident. Doc. 25-2 at 8. The institution returned without action the grievance because Moultrie's grievance addressed more than one issue or complaint. <u>Id.</u> at 9. Moultrie then authored three informal grievances seeking the use of force incident number for the May 26, 2022 use of force or otherwise complaining about not receiving responses to other requests for the incident number. <u>Id.</u> at

10 (dated July 11, 2022; log #201-2207-0125), 11 (dated August 6, 2022; log #510-2208-0117), 12 (dated August 20, 2022; log #510-2208-0548). The institution returned all three informal grievances. See id.

On June 16, 2022, Moultrie submitted a formal grievance (log #2206-201-112) indicating that he previously submitted a formal grievance requesting the institution retain the use of force video evidence from the May 26, 2022 incident but that he had not received a response. Id. at 17. He stated that the video would show "that prior to having chemical agents used against [him, he] was still in hand-restraints and that after chemical agents w[ere] used against [him, he] was not non-compliant and refused to return to [his] cell." Id. The Acting Warden denied the grievance, noting that the institution had not received a prior request relating to retention of video evidence, but that the Office of the Inspector General is required to retain and retrieve all related video and audio recordings that record a use of force incident. Id. at 16.

Next, on June 21, 2022, Moultrie submitted a formal grievance (log #2206-201-140), "[i]n reference to [his] fabricated Close Management Referral." Id. at 19. Moultrie requested an investigation into CLO Minshew "for filing a false referral against [him] on 06/02/22 which resulted in an approved CM2 placement." Id. Moultrie continued:

10

On May 26, 2022, I was outside of my cell for I declared a psychological emergency being that I overdosed on my medication and was hallucinating. After seeing the Mental Health Counselor I was placed in the holding cell awaiting authorization from Counselor's supervisor who erroneously reverted my situation back to security. Security wanted to place me back in the cell [with] my cellmate which I refused and so the "hand-held" video camera was brought out. I was moved from the holding cell to the shower where upon a strip search was conducted. After the search security still wanted to put me in the cell with my cellmate and so I threw myself into the shower door all while screaming the shift supervisor did it and fell to the floor on my stomach hoping this type of behavior would change securit[y's] decision on putting me in the cell with someone however it did not. Additional staff was then called and I was carried to the cell, whereupon my cellmate was ordered into hand-restraints and instructed to stand in the back of the cell and officers brought me in and la[i]d me on the floor and left securing the cell door. As the video shall reflect I refused to relinquish my hand-restraints so my cellmate and I were both left in hand-restraints whereupon an officer returned a few seconds [later] and utilized chemical agents on me. I was then t[a]ken out [of] the cell and placed in the decontamination shower and seen [by] medical all while being escorted by the shift supervisor and (1) officer, and finally placed in a cell by myself.

So as you can see if the video of the use-of-force is reviewed you'll conclude it coincides with my statement of facts for it would've been impossible to choke my cellmate when we both were in hand restraints the entire time I was in the cell. It would [have] also been impossible to kick staff while laying on my stomach.

To add more dishonesty to CLO Minshew[']s character he put in a recommendation that I was released from Close Management on 05/21/2022. I came to Columbia CI on 04-14-2022 from another general population institution. I got off of CM for the first and only time [i]n February 2020.

Through CLO Minshew[']s action and behavior he's shown multiple acts of bad-faith. His actions exhibit a wanton and willful disregard of my right to liberty, such as wrongfully seeking me to be placed in segregation depriving me of privileges. CLO Minshew most certainly acted outside the scope of his employment and professionalism seeking to concoct and or misrepresent the facts in order to have me recommended and approved for CM status. He acted with reckless indifference to my rights. His intent was completely maliciously motivated and again if the investigator of the grievance was to review the entire event via hand-held video camera they shall concur with my statement of facts.

Id. at 19-20.

The institution denied Moultrie's formal grievance, stating:

Custody decisions, and institutional and program assignments are made in accordance with security interests and the program and treatment needs of the inmate. These decisions are based on the professional judgment and correctional experience of staff involved. Your placement in close management has been through your own behavior. Your record reveals that you have demonstrated an inability to live in the general population without abusing the rights and privileges of other inmates or disturbing the security, order or operation of the institution. Furthermore, you are advised that it is not within an inmate's scope of responsibility or authority to

12

> recommend disciplinary action regarding staff. Your complaint was addressed and responded to; any further action will be at the discretion of the administrative staff.

Id. at 18.

Next, Moultrie submitted a formal grievance (log #2208-510-070) complaining about the response he received to his August 6, 2022 informal grievance, which advised Moultrie that he needed to submit a request to Columbia Correctional Institution where the incident occurred. Id. at 23. The institution returned without action his formal grievance "for by-passing the previous level of review as required," because the institution had "returned without action or processing" the informal grievance he complained about, and the rules require that an informal grievance be "denied before a formal grievance can be initiated." Id. at 22.

On May 30, 2022, Moultrie filed a grievance appeal (log #22-6-16843), in which he stated:

> I'm filing this grievance to the Warden of this institution[5] per Rule 33-103.006, F.A.C. following a use-of-force incident that occurred on 5/26/22 which was totally against policy and procedure and could of gotten individuals seriously hurt.

_____

[5] In addressing to whom the grievance should be sent, Moultrie checked the box next to "Secretary, Florida Department of Corrections." Doc. 25-1 at 19.

On 5/26/22 I declared a mental health emergency due to my ignorance of consuming 10, 100mg Zoloft at one time and been awake for several days straight. Combined with barely eating the mind-bending effects of sleep deprivation had me both paranoid and hallucinating. I seriously felt my roommate wanted to kill me once I close my eyes or I him if the being commanded me to.

After speaking to mental health they ordered that I be placed in the holding cell but sometime later security had to assemble a squad of officers to literally carry me back into my original cell with my then cellmate. Captain James moved me to put me in the vacant psych cell next door but Sgt. Harper overruled him and said I was going back in my original cell. For a Captain to submit to a[] Sergeant in such a serious security which could of gotten some[one] killed is beyond me. Captain James shouldn't be a Captain in my opinion. After being placed in the cell I refused to relinquish the hand restraints and an Ofc. returned a moment later and deployed chemical agents stating I was attacking my roommate. After being decontaminated I was finally placed by myself where I got some much needed sleep.

The[] purpose of this grievance is for both Capt. James and Sgt. Harper's handling of the situation was only to place me [and] my cellmate in a dangerous situation. I respectfully ask that an investigator review the video footage of the incident to see exactly everything they did wrong.

Doc. 25-1 at 19.

The Secretary's office "returned without action" this grievance appeal,

noting that the appeal was not in compliance with the rules because Moultrie

either did not file a formal grievance addressing this issue or he did not include a copy of it with his grievance appeal. Id. at 17. Additionally, the response stated:

> When making allegations of staff misconduct, you need to provide all pertinent information, such as names, dates, times, places and specific details, for a proper review.
>
> Furthermore, a copy of your grievance has been forwarded to the Warden's office for review.
>
> Your request for retention and/or review of video/audio needs to be initiated at the institutional level . . . .

Id.

On June 30, 2022, Moultrie authored two grievance appeals.[6] The first (log #22-6-19919) related to his request to preserve all video evidence relevant to the May 26, 2022 use of force. Id. at 8 (noting he was appealing the response to formal grievance log #2206-201-112). The Secretary's office denied the grievance appeal, advising that the institution properly responded to Moultrie's grievance. Id. at 7. In the second grievance appeal (log #22-6-20035), Moultrie complained about the response he received to one of his formal

---

[6] While Moultrie dated the appeals June 30, 2022, he submitted them on July 6, 2022. See Doc. 25-1 at 8, 12.

grievances relating to Minshew's close management referral. Id. at 12.
Specifically, Moultrie stated:

> I submit this appeal to the Institution[']s
> response of log #2206-201-111[7] referring to my CM
> recommendation that was based on both false and
> misrepresentation of the facts. The ICT and SCO did
> not base their decision on facts presented in the video
> footage. If the ICT members had considered my
> evidence they would . . . have concluded the video was
> not consistent with the CLO recommendation. That
> following my psychological emergency I could not be
> placed back in the cell with anybody due to
> hallucinating and so I had force used against [me] to
> place me in the cell with someone and refused to
> relinquish the hand-restraints making it physically
> impossible to hold anyone in a "choke-hold." I was
> sprayed with chemical agents for not giving up my
> hand-cuffs. Not at anytime did I cause harm to or
> attempt[] to cause harm to anybody and video evidence
> shall support my allegations. . . .

> Furthermore, based on all these alleged rule
> violation I committed I did not receive any disciplinary
> infractions for the video would not have supported any
> of the fabricated account of events.

> Also including institutional adjustment: The
> CLO author stated I was released from CM on 5-21-22.
> I came to this Institution f[rom] another open
> Institution on 5-14-22. I was last on CM February
> 2020 and have displayed positive behavior from then
> up to this incident which again I declare was
> fabricated. The preservation and review of the video
> shall prove the institutional staff acted outside the
> scope of their employment, committed bad faith

---

[7] Defendants did not include a copy of formal grievance log #2206-201-111.

> exhibiting wanton and disregard from rights causing
> me to los[e] liberty.

Id. at 12. The Secretary's office denied Moultrie's grievance appeal for the following reasons:

> Custody decisions, as well as, institutional and program assignments are made in accordance with security interests and the program and treatment needs of the inmate. [T]hese[] decisions are based on the professional judgement and correctional experience of staff involved. Your placement in Close Management has been a result of your own behavior.

> Your Close Management status was reviewed in accordance with Chapter 33-601.800, F.A.C. The classification officer and the Institution Classification Team (ICT) recommended you for Close Management I and the State Classification Officer (SCO) approved Close Management II. You have not shown that the Report of Close Management included inaccurate information. Your placement in Close Management is not solely based on disciplinary reports that you have received. It also may include any incidents that you may have been involved in, as well. When the ICT and SCO determine that you no longer pose a security threat your Close Management status will be reduced.

Id. at 11.

Then, on July 8, 2022, Moultrie submitted a grievance appeal (log #22-6-21071), in which he appealed the formal grievance he had submitted on June 21, 2022 (log #2206-201-140). Id. at 22. He sought clarification on two issues relating to Minshew's close management recommendation:

17

In filing this request for administrative remedy or appeal, I am not referring it to me being placed on Close Management and seeking a reversal. I[']m filing it solely as a "complaint against staff" and hoping to receive a response either denying the allegation set forth as "false" or "concurring" with it as "facts." I attached a copy of the DC6-233c and respectfully ask if it[']s no inconvenience would the reviewer of this complaint base[] their response against real evidence.

1.      In the DC6-233, CLO Minshew alleged I was released from Close Management on 05/21/2022. Is that true? If not, when does the record show I been released from Close Management?

2.      In my allegation I claimed officers had to use force to put me in a cell with another prisoner and after refusing to relinquish handcuffs an officer returned seconds later a[nd] utilized chemical agents on me, and then placed me in a cell by myself without the assistance of staff. On the contrary CLO Minshew claimed officers observed me assaulting my roommate so chemical agents was deployed and then after coming from decontamination I dropped to the floor and officers carry me to my assigned cell. If available I would ask that the use-of-force video camera be utilized in assessing the truth in each allegation to determine whose [sic] telling the truth. UOF date 5/26/22; H2 [at] 2pm-4pm.

Again I am not appealing the SCO decision for CM approval in this grievance, I'm just illustrating for the lawyers, the Court and dept. of Corrections that CLO Minshew fabricated and misrepresented the facts of the CLO statement of facts.

Id. at 22.

18

In response to this grievance appeal, the Secretary's office stated:

> You have raised issues in your appeal that were not raised in the formal grievance and therefore, will not be addressed by this office.
>
> Your request for administrative appeal is in non-compliance with the Rules of the Department of Corrections . . . . The rule requires that you first submit your grievance at the appropriate level at the institution. You have not done so, or you have not provided this office with a copy of that grievance, nor have you provided a valid or acceptable reason for not following the rules.
>
> When making allegations of staff misconduct, you need to provide all pertinent information, such as names, dates, times, places and specific details, for a proper review.
>
> Furthermore, a copy of your grievance has been forwarded to the Warden's office for review.
>
> The institution should be given the opportunity to respond to your issue.
>
> . . . .
>
> Based on the foregoing information, your grievance is returned without action.

Id. at 20.

Finally, on August 5, 2022, Moultrie submitted a grievance appeal (log #22-6-23941) complaining about not receiving a response to formal grievance log #22-6-20035, "in reference to Columbia C.I. staff depriving [Moultrie] of

liberty, concocting false allegations against [him] to be sent to Close Management," and another grievance he filed relating to the retention of the use of force videos from the May 26, 2022 incident. <u>Id.</u> at 28. The Secretary's office "returned without action" this grievance appeal, with a notation that grievance log #22-6-20035 was timely denied on July 20, 2022 and mailed to Moultrie. <u>Id.</u> at 27.

**b. Prison Litigation Reform Act (PLRA) Requirements**

The Eleventh Circuit Court of Appeals has held the exhaustion of administrative remedies by a prisoner is "a threshold matter" to be addressed before considering the merits of a case. <u>Chandler v. Crosby</u>, 379 F.3d 1278, 1286 (11th Cir. 2004); <u>see also Myles v. Miami-Dade Cnty. Corr. & Rehab. Dep't</u>, 476 F. App'x 364, 366 (11th Cir. 2012)[8] (noting that exhaustion is "a 'threshold matter' that we address before considering the merits of the case") (citation omitted). It is well settled that the PLRA requires an inmate wishing to challenge prison conditions to first exhaust all available administrative remedies before asserting any claim under 42 U.S.C. § 1983. <u>See</u> 42 U.S.C. §

---

[8] The Court does not rely on unpublished opinions as binding precedent; however, when cited in this Order it is because the Court finds them persuasive on a particular point. <u>See</u> <u>McNamara v. GEICO</u>, 30 F.4th 1055, 1060-61 (11th Cir. 2022); <u>see generally</u> Fed. R. App. P. 32.1; 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

1997e(a); <u>Porter v. Nussle</u>, 534 U.S. 516, 524 (2002). A prisoner, however, is not required to plead exhaustion. <u>See</u> <u>Jones v. Bock</u>, 549 U.S. 199, 216 (2007). Instead, the United States Supreme Court has recognized that "failure to exhaust is an affirmative defense under the PLRA[.]" <u>Id.</u> Notably, exhaustion of available administrative remedies is "a precondition to an adjudication on the merits" and is mandatory under the PLRA. <u>Bryant v. Rich</u>, 530 F.3d 1368, 1374 (11th Cir. 2008). Not only is there an exhaustion requirement, the PLRA "requires proper exhaustion." <u>Woodford v. Ngo</u>, 548 U.S. 81, 93 (2006).

> Because exhaustion requirements are designed to deal with parties who do not want to exhaust, administrative law creates an incentive for these parties to do what they would otherwise prefer not to do, namely, to give the agency a fair and full opportunity to adjudicate their claims. Administrative law does this by requiring proper exhaustion of administrative remedies, which "means using all steps that the agency holds out, and doing so <u>properly</u> (so that the agency addresses the issues on the merits)." <u>Pozo</u>,[9] 286 F.3d, at 1024 (emphasis in original).

<u>Woodford</u>, 548 U.S. at 90. And, "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." <u>Id.</u>

The United States Supreme Court has instructed that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's

---

[9] <u>Pozo v. McCaughtry</u>, 286 F.3d 1022 (7th Cir. 2002).

exhaustion requirement. The only limit to § 1997e(a)'s mandate is the one baked into its text: An inmate need exhaust only such administrative remedies as are 'available.'" Ross v. Blake, 578 U.S. 632, 648 (2016). For an administrative remedy to be available, the "remedy must be 'capable of use for the accomplishment of [its] purpose.'" Turner v. Burnside, 541 F.3d 1077, 1084 (11th Cir. 2008) (quoting Goebert v. Lee Cnty., 510 F.3d 1312, 1322-23 (11th Cir. 2007)). In Ross, the Supreme Court identified three circumstances in which an administrative remedy would be considered "not available." Ross, 578 U.S. at 643-44. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 643. Next, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Finally, a remedy may be unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 644.

Because failure to exhaust administrative remedies is an affirmative defense, a defendant bears "the burden of proving that the plaintiff has failed to exhaust his available administrative remedies." Turner, 541 F.3d at 1082.

In accordance with Eleventh Circuit precedent, a court must employ a two-step process when examining the issue of exhaustion of administrative remedies.

> After a prisoner has exhausted the grievance procedures, he may file suit under § 1983. In response to a prisoner suit, defendants may bring a motion to dismiss and raise as a defense the prisoner's failure to exhaust these administrative remedies. See Turner, 541 F.3d at 1081. In Turner v. Burnside we established a two-step process for resolving motions to dismiss prisoner lawsuits for failure to exhaust. 541 F.3d at 1082. First, district courts look to the factual allegations in the motion to dismiss and those in the prisoner's response and accept the prisoner's view of the facts as true. The court should dismiss if the facts as stated by the prisoner show a failure to exhaust. Id. Second, if dismissal is not warranted on the prisoner's view of the facts, the court makes specific findings to resolve disputes of fact, and should dismiss if, based on those findings, defendants have shown a failure to exhaust. Id. at 1082-83; see also id. at 1082 (explaining that defendants bear the burden of showing a failure to exhaust).

Whatley v. Warden, Ware State Prison, 802 F.3d 1205, 1209 (11th Cir. 2015). At step two of the procedure established in Turner, the Court can consider facts outside the pleadings as long as those facts do not decide the case and the parties have had sufficient opportunity to develop the record. Bryant, 530 F.3d at 1376; see also Jenkins v. Sloan, 826 F. App'x 833, 838-39 (11th Cir. 2020). In evaluating whether a plaintiff has satisfied the exhaustion requirement, the Court notes that the Eleventh Circuit has determined that a "prisoner need

not name any particular defendant in a grievance in order to properly exhaust his claim." <u>Parzyck v. Prison Health Servs., Inc.</u>, 627 F.3d 1215, 1218 (11th Cir. 2010).

### c. Florida's Prison Grievance Procedure

State law "determines what steps are required to exhaust." <u>Dimanche v. Brown</u>, 783 F.3d 1204, 1207 (11th Cir. 2015); <u>see also</u> <u>Jones</u>, 549 U.S. at 218 (stating that "it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion"). The FDOC provides an internal grievance procedure for its inmates. <u>See</u> Fla. Admin. Code R. 33-103.001 through 33-103.018. Generally, to properly exhaust administrative remedies, a prisoner must complete a three-step sequential process. First, an inmate must submit an informal grievance at the institutional level to a designated staff member responsible for the specific problem. <u>See</u> Fla. Admin. Code R. 33-103.005. If the issue is not resolved, the inmate must submit a formal grievance at the institutional level. <u>See</u> Fla. Admin. Code R. 33-103.006. If the matter is not resolved through formal and informal grievances, the inmate must file an appeal to the Office of the FDOC Secretary. <u>See</u> Fla. Admin. Code R. 33-103.007. However, under certain specified circumstances, an inmate can bypass the informal-grievance stage and start with a formal grievance at the institutional level. <u>See</u> Fla. Admin. Code R. 33-103.005(1); 33-103.006(3). Or

an inmate can completely bypass the institutional level and proceed directly to the Office of the FDOC Secretary by filing a "direct grievance." See Fla. Admin. Code R. 33-103.007(3). Emergency grievances and grievances of reprisal are types of "direct grievances" that may be filed with the Office of the FDOC Secretary. See Fla. Admin. Code R. 33-103.007(3)(a).[10]

Florida Administrative Code Rule 33-103.011 provides time frames for the submission of grievances. Informal grievances must be received within twenty days from the date on which the grieved incident or action occurred. See Fla. Admin. Code R. 33-103.011(1)(a). Formal grievances must be received no later than fifteen days from the date of the response to the informal grievance. See Fla. Admin. Code R. 33-103.011(1)(b). Similarly, grievance appeals to the Office of the FDOC Secretary must be received within fifteen

---

[10] None of the enumerated exceptions apply to Moultrie's excessive force claims; thus, he was not permitted to skip the informal grievance step. See Fla. Admin. Code R. 33-103.005(1) ("Inmates may skip [the informal grievance] step and initiate the process at the formal institutional level for issues pertaining to the following: grievance of an emergency nature, grievance of reprisal, grievance alleging violations of the Americans with Disabilities Act, medical grievance, grievance involving gain time[,] . . . grievance challenging placement in close management or subsequent reviews, grievances regarding the return of incoming mail[,] . . . grievances regarding disciplinary action (does not include corrective consultations)[,] . . . and grievances regarding allegations of sexual abuse . . . . Inmates may proceed directly to the Office of the Secretary on the following issues[:] . . . grievance of emergency nature, grievance of reprisal, protective management, admissible reading material, sentence structure issues (release date calculations), and inmate banking issues. Grievances alleging a violation of the Health Insurance Portability and Accountability Act (HIPAA) must be filed directly with the Office of the Secretary . . . .").

days from the date that the response to the formal grievance is returned to the inmate. See Fla. Admin. Code R. 33-103.011(1)(c). According to Rule 33-103.014, an informal grievance, formal grievance, direct grievance, or grievance appeal "may be returned to the inmate without further processing if, following a review of the grievance, one or more . . . conditions are found to exist." Fla. Admin. Code R. 33-103.014(1). The rule provides an enumerated list as "the only reasons for returning a grievance without a response on the merits." See Fla. Admin. Code R. 33-103.014(1)(a)-(y). A grievance can be returned without action if it: is untimely; "addresses more than one issue or complaint"; is "so broad, general or vague in nature that it cannot be clearly investigated, evaluated, and responded to"; is "not written legibly and cannot be clearly understood"; is a supplement to a previously-submitted grievance that has been accepted for review; does not "provide a valid reason for by-passing the previous levels of review as required or the reason provided is not acceptable"; or does not include the required attachments. See Fla. Admin. Code R. 33-103.014(1).

### d. Exhaustion Analysis

Under the first step of the Turner analysis, the Court must review the Motion and Response and accept as true Moultrie's allegations. See Whatley,

26

802 F.3d at 1209. In doing so, the Court finds that dismissal is not appropriate at step one. Thus, the Court turns to the second step of Turner.

As summarized above, Moultrie filed several grievances, and the grievance logs clearly reflect that he knew how to use the grievance process. He contends, however, that the institution did not start processing his grievances until he complained to the Secretary's office on June 8, 2022, and by the time he received the Secretary's office's June 14, 2022 response, more than twenty days had passed since the May 26, 2022 incident.[11] Thus, according to Moultrie, "the Institution made it impossible for him to complete the first two-steps of the grievance process within the '20 days from the time [the] event being grieved occurred'" because the institution was not processing grievances. Response at 6-7. In support, Moultrie cites to the grievance log showing that he filed an appeal around June 8, 2022 (log #22-6-16842), regarding the institution not following the grievance procedures, and a copy of the Secretary's office's response dated June 14, 2022, was mailed to him on June 17, 2022. See Doc. 25-1 at 3.[12] Moultrie argues that this is further

_____

[11] The twentieth day would have fallen on June 15, 2022.

[12] The record does not contain a copy of this grievance appeal or response. The appeal log notes that Moultrie submitted a grievance appeal, which was given a class code of "09E – NOT FOLLOW GRV PROC (GRV PROC)" around June 8, 2022, the Secretary's office "returned" the grievance appeal on June 14, 2022, and mailed a copy of the response to Moultrie on June 17, 2022. Doc. 25-1 at 3. Because this grievance

confirmed by the informal and formal grievance logs showing that between May 26 and June 15, 2022, the institution did not log any formal or informal grievances from Moultrie, but on June 16 and 20, 2022, the institution started processing his formal and informal grievances, respectively. Doc. 25-2 at 3, 13. As an example, Moultrie asserts that the May 30, 2022 grievance appeal (log #22-6-16843) was a copy of the grievance he submitted to the institution; but as shown by the grievance logs, the copy provided to the institution was not processed, yet the copy sent to the Secretary's office was processed. See Response at 6.

Moultrie's argument is flawed. If an inmate does not receive a response to a grievance within the time allotted, the inmate is permitted to proceed to the next level of the grievance process. See Fla. Admin. Code r. 33-103.011(4) ("Unless the grievant has agreed in writing to an extension, expiration of a time limit at any step in the process shall entitle the complainant to proceed to the next step of the grievance process. If this occurs, the complainant must clearly indicate this fact when filing at the next step."). Thus, if Moultrie submitted an informal or formal grievance at the institutional level and did not receive a response because the institution failed to process the grievance,

---

was "returned" instead of "approved" or "denied," this grievance appeal was not properly filed either.

Moultrie could have proceeded to the next level of review and "clearly indicate" that he filed a grievance at the lower level but did not receive a timely response. Moultrie did not do that here. Thus, his argument that the institution was not processing his grievances between the date of the incident and June 15, 2022, did not render the process unavailable to him or otherwise excuse his noncompliance.[13] See Bracero v. Sec'y, Fla. Dep't of Corr., 748 F. App'x 200, 204 (11th Cir. 2018) ("The grievance procedure permitted [the plaintiff] . . . to proceed with the next step in the three-step process after the expiration of the prison's time to respond to a grievance," and "[w]hile the PLRA does not require prisoners to grieve a breakdown in the grievance process, [the plaintiff] has not shown such a breakdown[, a]nd the PLRA required him to pursue the procedures that were available to him").

Moultrie further argues that although his May 30, 2022 grievance appeal (log #22-6-16843) was "returned without action," the Secretary's office actually took action by sending his grievance to the Warden, and thus, he properly exhausted his administrative remedies because "the Institution cannot deny

---

[13] Additionally, after Moultrie received the Secretary's office's response regarding his appeal about the institution not processing his grievances, and according to Moultrie, the institution began processing his grievances, he also had the option of submitting an untimely informal grievance and "clearly demonstrat[ing]" that "it was not feasible to file the grievance within the relevant time periods and that [he] made a good faith effort to file in a timely manner." Fla. Admin. Code R. 33-103.011(2).

being aware of the complaint nor the issues raised in it." Response at 9. But the Secretary's office's response returned the grievance because it was not in compliance with the FDOC's rules, in that Moultrie failed to follow the three-step grievance process. Because the response explicitly relied on a procedural defect to "return" the appeal without action, the Court defers to that finding for purposes of the exhaustion analysis. Filing a non-compliant grievance does not satisfy the exhaustion requirement regardless of whether it puts the institution "on notice" of the inmate's claims. See Woodford, 548 U.S. at 90 (recognizing that the law requires "proper exhaustion of administrative remedies, which means using all steps that the agency holds out, and doing so properly") (internal quotations and citation omitted).

Finally, while Moultrie discussed the incident in his June 21, 2022 formal grievance (log #2206-201-140), the purpose of that formal grievance was to request an investigation into Minshew for filing a "false referral." Doc. 25-2 at 19. Moultrie's allegations in that grievance did not notify the institution that Moultrie was actually complaining about the May 26, 2022 incident involving Defendants James and Hansen.[14] Regardless, Moultrie's appeal of that formal

---

[14] Moultrie also mentioned being forced into a cell with a cellmate and being sprayed with chemical agents in grievance appeal log #22-6-20035, which was denied; however, the purpose of that appeal was to call into question Minshew's referral to close management and the ICT members' decision. Indeed, a fair reading of the

grievance was returned without action (log #22-6-21071). <u>See</u> Doc. 25-1 at 22. Thus, Moultrie did not properly complete the three-step grievance process.

None of Moultrie's other grievances address the claims in this case and he did not properly follow the grievance procedure to exhaust his claims before filing this case. Moreover, the record fails to support a finding that the grievance process was unavailable to him. Thus, Defendants' Motion is due to be granted to the extent they seek dismissal of this case for Moultrie's failure to exhaust.

Accordingly, it is

**ORDERED**:

1.     Defendants' Motion to Dismiss (Doc. 25) is **GRANTED to the extent** that this case is **DISMISSED without prejudice** for Moultrie's failure to exhaust his administrative remedies.

---

grievance appeal would not alert the Secretary's office that Moultrie was complaining about the actions of Defendants James and Hansen.

2.     The **Clerk** shall enter judgment dismissing this case without prejudice for Moultrie's failure to exhaust his administrative remedies, terminate any pending motions, and close the file.

**DONE AND ORDERED** at Jacksonville, Florida, this 2nd day of July, 2024.


**MARCIA MORALES HOWARD**
United States District Judge


JAX-3 6/27
c:
Eddie James Moultrie, #J54553
Counsel of Record